UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------x

LYNN PATRICK,

Plaintiff,

vs.

16-cv-02789(WFK)(PK)

ADJUSTERS INTERNATIONAL, INC.; LAURA PHILLIPS, in her individual capacity; JOHN COVELL, in his individual capacity; and FLORENCE NELSON, in her individual capacity,

Defendants.

------------------------------------x

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

VLADECK, RASKIN & CLARK, P.C.
Attorneys for Plaintiff
565 Fifth Avenue, 9th Floor
New York, New York 10017
(212) 403-7300

Of Counsel:
Anne L. Clark
Renay M. Oliver

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

STATEMENT OF FACTS ..... 2

ARGUMENT ..... 16

I. THE SUMMARY JUDGMENT STANDARD ..... 16

II. PLAINTIFF'S SEX-BASED HARASSMENT CLAIM SHOULD NOT BE DISMISSED ..... 17

A. The Harassment Was Based on Sex ..... 18

B. The Harassment Was Sufficiently Severe or Pervasive ..... 22

C. Defendant is Liable for the Harassment ..... 24

III. PLAINTIFF'S RETALIATION CLAIM SHOULD NOT BE DISMISSED ..... 28

IV. PUNITIVE DAMAGESCANNOT BE PRECLUDED AT THIS STAGE ..... 32

V. PER DIEM PAYMENTS ARE PART OF MAKE-WHOLE RELIEF ..... 34

CONCLUSION ..... 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Albermarle Paper Co. v. Moody,
422 U.S. 405 (1975)....34

Back v. Hastings on Hudson Union Free Sch. Dist.,
365 F.3d 107 (2d Cir. 2004)....16

Baez v. Anne Fontaine USA, Inc.,
No. 14-cv-6621 (KBF), 2017 WL 57858 (S.D.N.Y. Jan. 5, 2017)....2

Batten v. Glob. Contact Servs., LLC,
No. 15-CV-2382 (NG)(SJB), 2018 WL 3093968 (E.D.N.Y. June 22, 2018)....34

Beale v. Mount Vernon Police Dep't,
895 F. Supp. 2d 576 (S.D.N.Y. 2012)....20

Bennett v. Health Mgmt. Sys., Inc.,
936 N.Y.S.2d 112, 92 A.D.3d 29 (App. Div. 2012)....17

Brabson v. The Friendship House of W. N.Y.,
46 F. App'x 14 (2d Cir. 2002)....28

Brown v. Henderson,
257 F.3d 246 (2d Cir. 2001)....20

Castagna v. Luceno,
558 F. App'x 19 (2d Cir. 2014)....20, 21

Castagna v. Luceno,
No. 09 Civ. 9332(ER), 2013 WL 440689 (S.D.N.Y. Feb. 4, 2013)....20, 21, 22

Chambers v. TRM Copy Ctrs. Corp.,
43 F.3d 29 (2d Cir. 1994)....16

Chauca v. Abraham,
30 N.Y.3d 325, 89 N.E.3d 475 (2017)....33

Chauca v. Abraham,
885 F.3d 122 (2d Cir. 2018)....34

Creacy v. BCBG Max Azria Group, LLC,
No. 14 Civ. 10008 (ER), 2017 WL 1216580 (S.D.N.Y. Mar. 31, 2017)....22, 27, 33

Cruz v. Coach Stores, Inc.,
202 F.3d 560 (2d Cir. 2000)....22

Curtis v. Airborne Freight Co.,
87 F. Supp. 2d 234 (S.D.N.Y. 2000)....20

Cush-Crawford v. Adchem Corp.,
271 F.3d 352 (2d Cir. 2001)....32

In re Dana Corp.,
574 F.3d 129 (2d Cir. 2009)....17

Delville v. Firmenich Inc.,
920 F. Supp. 2d 446 (S.D.N.Y. 2013)....18

E.E.O.C. v. Kallir, Philips, Ross, Inc.,
420 F. Supp. 919 (S.D.N.Y. 1976), aff'd, 559 F.2d 1203 (2d Cir. 1977)....34

E.E.O.C. v. Suffolk Laundry Servs.,
48 F. Supp. 3d 497 (E.D.N.Y. 2014)....28

Ellison v. Brady,
924 F.2d 872 (9th Cir. 1991)....23, 28

Epstein v. Kalvin-Miller Int'l, Inc.,
139 F. Supp. 2d 469 (S.D.N.Y. 2001)....34

Fisher v. Mermaid Manor Home for Adults, LLC,
No. 14-CV-3461 (WFK)(JO), 2016 WL 7330554 (E.D.N.Y. Dec. 16, 2016)....18, 22, 28

Fisher v. Mermaid Manor Home for Adults, LLC,
192 F. Supp. 3d 323 (E.D.N.Y. 2016)....20, 24, 25, 28

Gutierrez v. Taxi Club Mgmt., Inc.,
No. 17 Civ. 532 (AMD)(VMS), 2018 WL 3432786 (E.D.N.Y. June 25, 2018)....34

Ingram v. Madison Square Garden Ctr., Inc.,
482 F. Supp. 918 (S.D.N.Y. 1979)....34, 35

Kaytor v. Elec. Boat Corp.,
609 F.3d 537 (2d Cir. 2010)....17, 18, 19, 22

Kolstad v. Am. Dental Ass'n,
527 U.S. 526 (1999)....32, 33

Kopp v. Samaritan Health Sys.,
13 F.3d 264 (8th Cir. 1994)....18, 20

Mihalik v. Credit Agricole Cheuvreaux, N.A., Inc.,
715 F.3d 102 (2d Cir. 2013)....17, 24

Parrish v. Sollecito,
280 F. Supp. 2d 145 (S.D.N.Y. 2003)....32

Redd v. N.Y. Div. of Parole,
678 F.3d 166 (2d Cir. 2012)....16

Reeves v. Sanderson Plumbing Prods., Inc.,
530 U.S. 133 (2000)....17

Steiner v. Showboat Operating Co.,
25 F.3d 1459 (9th Cir. 1994)....19, 23, 28

Summa v. Hofstra Univ.,
708 F.3d 115 (2d Cir. 2013)....24, 26, 29

Swiderski v. Urban Outfitters, Inc.,
No. 14-CV-6307, 2017 WL 6502221 (S.D.N.Y. Dec. 18, 2017)....25, 27, 28

Walsh v. N.Y.C. Hous. Auth.,
828 F.3d 70 (2d Cir. 2016)....17

Zakre v. Norddeutsche Landesbank Girozentrale,
396 F. Supp. 2d 483 (S.D.N.Y. 2005)....20

Zakre v. Norddeutsche Landesbank Girozentrale,
541 F. Supp. 2d 555 (S.D.N.Y. 2008)....32, 33

Zann Kwan v. Andalex Grp. LLC,
737 F.3d 834 (2d Cir. 2013)....29

Zimmermann v. Assocs. First Capital Corp.,
251 F.3d 376 (2d Cir. 2001)....32

**Statutes**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.... *passim*

New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. .... *passim*

New York Labor Law, N.Y. Lab. Law § 190 et seq.... *passim*

New York City Human Rights Law, N.Y.C. Admin Code § 8-101 et seq.... *passim*

had unlocked the bins and intentionally placed boxes of files inside. (Id. ¶ 258) Kinney admitted that he had a key to the bins. (Id. ¶ 257) In Kinney's presence, Patrick told Maiellano of Kinney's threat to throw out the files; Kinney did not deny the threat. (Id. ¶ 256)

It became apparent that Kinney had either directed his staff to move the State files or had done so himself. (Pl. 56.1 ¶ 258) Indeed, at one point Patrick asked Kinney how a particular shredder bin full of State files had been moved. (Id.) Kinney claimed not to know, but then suggested that Patrick check under the tables on the seventh floor. (Id.) When Patrick did so, she found additional State files that had not been there previously. (Id.)

Maiellano asked Patrick to meet with him in his office and give an account of the past few days' events to Laura DeFuria, who worked assisting Cleaves. (Id. ¶ 260) DeFuria later sent Patrick a draft of her statement so that Patrick could add any necessary details. (Id.)

Kinney Threatens Patrick

On Saturday, October 18, 2014, Patrick was walking down the subway station stairs near the FEMA building to go to the 9/11 museum with her family. (Pl. 56.1 ¶ 261) Kinney, who had been inside the FEMA building, ran to the subway entrance and called out Patrick's name. (Id. ¶ 262) Patrick stopped on the stairs and turned to see Kinney there. (Id.) Patrick's family did not realize that she had stopped and continued into the station without her. (Id. ¶ 263)

Kinney came closer to Patrick and loomed over her as she stood on the stairs. (Pl. 56.1 ¶ 264) He was visibly angry, yelled at Patrick, and asked if he had been nasty the day before. (Id.) Patrick said that he had not been. (Id.) Kinney said, "Well, I know some State files got thrown away, but we don't know who did it." (Id.) Kinney alternated between pointing his finger at Patrick and raising his arms and throwing them toward her, all while standing about two feet away from her. (Id. ¶ 265) Patrick asked if they could discuss the issue on Monday and tried to continue down

the subway steps. (Id. ¶ 266) Kinney stopped Patrick and said, "You know, that's funny because this thing went the whole way to the top and . . . I was told that Lynn Patrick had filed a personal complaint against me." (Id.) Patrick was frightened by Kinney's tone and body language. (Id. ¶ 267) Patrick moved quickly down the stairs to get away from him and rejoin her family. (Id.) Kinney called after her and said that they would both be called in to talk about the files on Monday. (Id.) By the time Patrick got to the museum, she was having an anxiety attack and returned home with her family. (Id. ¶ 268)

Complaints of Harassment

On Sunday, October 19, 2014, Patrick informed AI senior staff members Cleaves, Szymanski, and Maiellano that Kinney had accosted her over the weekend. (Pl. 56.1 ¶ 270) She told them that she wanted to file a complaint against Kinney. (Id.)

Because she was afraid of running into Kinney alone, Patrick asked a co-worker to escort her to work and through the garage on October 20, 2014. (Pl. 56.1 ¶ 272) In addition, that day Patrick met with Szymanski and Maiellano and told them of Kinney's escalating harassment of her. (Id. ¶ 273) She sent an outline of the files issue and promised another memorandum about Kinney's "harassment and intimidation." (Id. ¶¶ 275-76) Patrick continued to arrange for co-workers to escort her to and from the garage and through other parts of the building. (See Id. ¶ 289-91) Szymanksi notified John Marini, AI's Chief Operating Officer and Vice President, providing him with Patrick's timeline about the files and stating that they would be asking FEMA to fire Kinney due to his conduct toward Patrick. (Id. ¶¶ 278-79)

AI told Patrick that another FEMA logistics employee would be AI's point person. (Pl. 56.1 ¶ 285) However, on October 21, 2014, Kinney was on the seventh floor for most of the day to deal with flooding issues. (Id. ¶¶ 285-86) He snuck up behind Patrick, called her "Miss" in a

condescending tone, and then questioned Patrick about a still-outstanding request for whiteboards. (Id.) Patrick let Maiellano know that Kinney had been around her for most of the day. (Id.) Maiellano told Patrick to document Kinney's behavior and send the information to Szymanski. (Id. ¶¶ 285-86) Patrick did so the following day, sending Szymanski a document outlining the timeline of the harassment she experienced from Kinney. (Id. ¶¶ 281-86) Szymanksi forwarded Patrick's harassment log to Elena Avetsiuk, AI Human Resources ("HR"). (Id. ¶ 287)

Efforts to Obtain Assistance from FEMA

On October 22, 2014, Cleaves forwarded Patrick's harassment outline to John Covell, FEMA's Deputy Director for New York Sandy Recovery Office. (Pl. 56.1 ¶ 292) Cleaves, who had previously worked for FEMA, including as the EEO officer for his region, wrote that Patrick's information was "compelling" and that "immediate action has to be taken with the individual." (Id.) Covell agreed, stating that, "If any of this is even remotely accurate, this is very very serious." (Id. ¶ 293) Cleaves expressed concern to Covell that Kinney may become "more aggressive if not kept completely away." (Id. ¶ 295)

From October 24, 2014 through November 2014, Patrick had several meetings with Covell and/or Florence Nelson, a FEMA EEO officer. (Pl. 56.1 ¶ 297) At first Patrick was hopeful that Nelson would be able to assist her. (Id. ¶ 298) Like Cleaves, Nelson understood that what Patrick was complaining of was gender-based harassment. (Id.) Nelson also told Patrick that she had warned Kinney that Patrick's allegations were serious and that FEMA had fired employees for less. (Id.) However, it soon became clear that Nelson's true aim was to convince Patrick to withdraw her complaint against Kinney, and she pressed Patrick to sign a statement saying she was not making a formal complaint. (Id. ¶ 299) Cleaves also understood that Nelson's goal was to make Patrick withdraw her complaint. (Id. ¶ 300)

Covell also pressed Patrick not to file a formal complaint against Kinney. (Pl. 56.1 ¶ 303) At one point, he took a document from Patrick concerning FEMA complaint procedures and tore it up, saying that it did not apply to her. (Id.) In one meeting, Covell told Patrick that she should have someone escorting her to her car in the garage every evening. (Id. ¶ 304) He also told Patrick that if FEMA fired Kinney, they would not have "a bead on him" and that Patrick would not want that to happen. (Id.) Patrick understood Covell's comment to mean that, given Kinney's unpredictable behavior, it would be safer for Patrick if FEMA continued to employ Kinney and could keep an eye on him. (Id.) Covell also said that if Patrick were a man, "this" probably would not be an issue. (Id. ¶ 305) Covell's statements, which suggested that FEMA believed that Kinney was capable of violence towards Patrick because she was a woman, only made her more frightened. (Id.)

Although Patrick had been advised that Kinney was no longer the FEMA point-person and had been told to stay away from Patrick and the seventh floor, during late October and November, Patrick continued to see Kinney on the seventh floor on a regular basis. (Pl. 56.1 ¶¶ 286, 312, 352) For example, Kinney frequently made copies at the copy machine beside Patrick's desk despite there being other copy machines in the building, and other copy machines on her floor, further away from her. (Id. ¶¶ 312-13) Patrick left the area any time Kinney came near her. (Id. ¶ 314) Patrick complained to AI about Kinney's ongoing presence. (Id. ¶ 312) Patrick grew increasingly fearful. (Id.) As she testified, "[H]e made himself more available to me, around me more often. And that's alarming when an authoritative person tells someone [']You've been accused of harassing someone[,] stay away,['] and then they up their game." (Id. ¶ 315) Cleaves continued to raise concerns with Covell, including that, "Kinney may be more agitated by the fact that [Patrick] has raised her concerns to a formal level." (Id. ¶ 318)

In one email, Cleaves wrote, "I don't have any administrative leave options, which means the only option the State has is to release her from duty to ensure a safe and secure environment. This simply would not be fair or reasonable -- or even legal !! -- to do to someone who raised these very troubling incidents to our attention." (Pl. 56.1 ¶ 320) (emphasis added) On November 8, 2014, Patrick sent an email to Cleaves, Szymanski, and Maiellano, expressing frustration with FEMA's handling of her complaint. (Id. ¶ 323) She stated that she thought she should be speaking to a State EEO and legal officer and had a "strong need" to obtain legal representation for herself. (Id.) AI never arranged for a State EEO or legal officer to speak with Patrick. (Id. ¶ 325)

On November 12, 2014, Patrick sent another email to Maiellano complaining about the lack of action on her complaint. (Pl. 56.1 ¶ 330) She also reminded Maiellano that he was present when Covell said that she needed an escort around the FEMA building and that if FEMA fired Kinney he would be on the street and beyond its control. (Id.) On November 19, 2014, Patrick spoke with Rigling about her situation. (Id. ¶ 332) Rigling said that he had told Szymanski that Kinney was still coming to Patrick's floor after being told to stay away. (Id. ¶ 335) He said there was something AI management was not telling her and a reason they were not telling her. (Id.) He recommended she speak with AI HR rather than retain an attorney. (Id. ¶ 336)

On November 20, 2014, Patrick sent an email asking to speak with AI HR or AI legal, as neither had yet contacted her. (Pl. 56.1 ¶¶ 337-39) Later that day she had a conference call with Szymanski and AI President Ron Cuccaro. (Id. ¶ 342) Cuccaro said that Szymanski had just told him about Patrick's complaint of harassment, even though she had made the complaint a month earlier. (Id.) Cuccaro told Patrick that he would have AI HR and someone from AI's legal department speak with her. (Id.) In an email to Marini, Cuccaro wrote that AI was working with outside counsel "to help resolve this problem." (Id. ¶ 343)

The following day, November 21, 2014, Patrick had a conference call with AI HR Manager Avetsiuk and Stephen Surace, AI's Chief Financial Officer. (Pl. 56.1 ¶ 344) During the conference call, Surace and Avetsiuk agreed that Patrick should continue to have an escort to her car every evening. (Id.) However, Surace later emailed Patrick and told her that there was no need for Patrick to have an escort. (Id. ¶¶ 345-46) Patrick responded that she still needed an escort. (Id. ¶ 347) She also said that she was perplexed about their conversation as she was under the impression that AI legal had been informed of her issues weeks earlier. (Id. ¶ 348)

Patrick's last day at work before her scheduled demobilization was December 10, 2014. (Pl. 56.1 ¶ 356) She continued to see Kinney on her floor through early December 2014. (Id. ¶ 352) Although AI, particularly Cleaves, was initially supportive of Patrick, that changed when Cleaves left in mid-December 2014 and DeFuria was promoted into his position. (Id. ¶¶ 353-54)

During Patrick's demobilization period, Szymanski asked Patrick to continue to perform administrative tasks, such as preparing the weekly organizational charts that AI used to bill the State. (Pl. 56.1 ¶ 359) She did so from her home in Baldwinsville. (Id. ¶ 358) Szymanksi told her not to enter her time for the work she performed while demobilized, and that they would "work it out" when she returned in January 2015. (Id. ¶ 361)

Retaliatory Dismissal

On or about January 6, 2015, Szymanski emailed Patrick asking her to remobilize to Queens on January 18, 2015 and return to work the following day. (Pl. 56.1 ¶ 362) After some emails back and forth about a start date, Szymanski and Patrick agreed she would return January 20, 2015. (See Id. ¶¶ 363-65, 374)

On January 13, 2015, Patrick's attorneys sent a letter to AI, to the attention of Cuccaro, by overnight delivery, stating that she had claims of gender discrimination and retaliation, and that

they were concerned about AI's failure to take steps to ensure Patrick's safety upon her return. (Pl. 56.1 ¶ 366) Her attorneys sent similar letter to the State and FEMA. (Id.)

The next day, on January 14, 2015, Szymanski emailed Patrick and told her to stop preparing the organizational charts that she had been working on throughout her demobilization. (Pl. 56.1 ¶ 367)

Two days after AI received Patrick's complaint of discrimination through counsel, January 16, 2015, Cuccaro tried to get Patrick to quit. (Pl. 56.1 ¶ 370) Cuccaro wrote to Patrick that she "should not return to work" if she feared for her safety. (Id.)

Through her attorneys, Patrick advised AI that she intended to return to work. (Pl. 56.1 ¶ 373) However, on January 18, 2015, the day she was remobilized to Queens, Patrick went to the emergency room. (Id. ¶ 375) Patrick has gastroparesis, a medical condition consisting of partial paralysis of the stomach. (Id. ¶ 376) The condition causes food to remain in the stomach for an abnormally long time, resulting in severe and chronic nausea, vomiting, abdominal pain, stomach spasms, and body aches. (Id.) Stress is known to exacerbate gastroparesis. (Id.) Patrick was admitted to the hospital on January 19, 2015. (Id. ¶ 377) Her doctor cleared her to return to work on February 9, 2015. (Id. ¶ 385) During this period of illness, Patrick's husband and counsel kept AI updated about her status. (Id. ¶¶ 378-79, 382-85)

Patrick returned to work on February 9, 2015, and reported directly to Maiellano. (Pl. 56.1 ¶ 387) Maiellano escorted Patrick to the eighth floor where Szymanski's office was located. (Id. ¶ 389) Szymanski sat Patrick outside of his office. (Id.) This was unusual as Maiellano and most of AI's employees sat on the seventh floor where Patrick had been previously. (Id. ¶ 391) The only instruction Szymanski gave Patrick was to keep doing whatever work she had been doing for Maiellano. (Id.) However, all of Patrick's old work had been given to someone else. (Id. ¶ 392)

Patrick was no longer included on emails related to the matters she used to handle. (Id.) Moreover, after telling Patrick to continue with her old work, which had already been transferred, Szymanski stopped speaking to her. (Id.) That day and the next, Patrick had almost nothing to do. (Id.) In addition, because the eighth floor was one that Kinney was allowed to access freely, Patrick was afraid to leave her seat. (Id. ¶ 393)

The morning of February 9, 2015, Marini sent Chris Holmes, New York State Chief of Public Assistance, an email notifying him there was "an issue with Ms. Patrick" and stating that AI's attorney wished to speak with the State's attorney. (Pl. 56.1 ¶ 394) Holmes understood "the issue" to be Patrick's unresolved EEO complaint. (Id. ¶ 395) Holmes responded to Marini saying he understood Patrick was scheduled to return to work on January 20, but "for some reason did not," and mentioned her not having yet returned. (Id. ¶ 399) Marini did not clarify for Holmes the medical emergency that slightly delayed her return or told him that she was back at work on February 9, 2015. (Id. ¶ 400)

This was not the first time that AI and Holmes had discussed Patrick's complaint. (Pl. 56.1 ¶ 396) On January 21, 2015, Holmes emailed DeFuria asking if Patrick had returned to the JFO and asking what happened to "the FEMA guy she complained about." (Id.) DeFuria responded that Patrick had not returned as scheduled the prior day. (Id. ¶ 397) She wrote, "I learned something interesting about this yesterday," and said she could explain it over the phone. (Id.) Holmes instructed DeFuria to call his cellphone. (Id.) She later forwarded Holmes a number of documents relating to Patrick's complaints of harassment and the issue with the State files. (Id.)

On February 10, 2015, DeFuria sent an email to Holmes and his supervisor Andrew Feeney, stating in part: "I know you have heard from Marini regarding Mrs. Patrick – extremely frustrating. I spoke with Marini and he explained that basically both [the State] and AI are sitting

ducks until lawyers have a chance to connect and determine next steps." (Pl. 56.1 ¶ 402) In a later email that day, DeFuria stated that Patrick showed up the day before "Unannounced (-- to me, at least)." (Id. ¶ 406) DeFuria "reminded" Holmes that they had discussed on January 22 that they only needed three, rather than four, administrative assistants and that there was not enough work to "substantiate creating another admin position." (Id.) Holmes responded by saying that Patrick should be released. (Id. ¶ 408)

Holmes and Feeney typically rubber-stamped AI's recommendations as to who to let go as staffing was reduced unless they had an issue with someone's performance. (Pl. 56.1 ¶ 413) Holmes was not aware of any problems with Patrick's work. (Id. ¶ 414) Any information Holmes and Feeney had about Patrick, her performance, or her responsibilities would have come from DeFuria, who admitted she did not know what Patrick's responsibilities actually were. (Id. ¶ 433) Had AI decided to keep Patrick and release another administrative assistant, the State would have had no objection. (Id. ¶ 414) Cleaves had never known the State to make recommendations as to which administrative assistant to release. (Id. ¶ 413) The State and AI had made reductions on January 23, 2015; neither Patrick nor any other employee in an administrative position was included on the list or discussed. (Id. ¶ 415)

DeFuria, after altering parts of her email chains with the State, emailed Marini with Holmes's and Feeney's statements to release Patrick. (Pl. 56.1 ¶¶ 416-18) The evening of February 10, 2015, Szymanksi emailed Cuccaro, Marini and outside counsel attaching the standard demobilization letter and asking if it was "still appropriate." (Id. ¶ 421) The letter was then modified. (Id.)

When Patrick arrived to work on February 11, 2015, Szymanski called her into his office. (Pl. 56.1 ¶ 423) Maiellano was there was well, at Cuccaro's direction. (Id. ¶¶ 422-23) Szymanski

claimed that Patrick was being demobilized immediately because the State had asked the Company to take Patrick off of the assignment. (Id. ¶ 423) Maiellano brought Patrick to his office to collect her equipment and then asked another AI employee to escort Patrick directly out of the building, without allowing Patrick to collect her personal belongings. (Id. ¶ 424) AI did not give Patrick any instructions as to how to demobilize. (Id.) Later that morning, Szymanski sent Patrick an email stating that she was being demobilized "at the request of NY State." (Id. ¶ 425)

Patrick's demobilization was not handled according to standard AI practice. (Pl. 56.1 ¶ 427) AI generally gives its employees advanced notice of a demobilization along with instructions concerning travel and expenses. (Id.) Moreover, Patrick had never seen AI escort off of the premises an employee who was merely being demobilized. (Id. ¶ 428)

AI employees often move on to other disasters. (Pl. 56.1 ¶ 434) When staffing new disasters, AI typically considers people who have worked on past disasters. (Id. ¶ 435) After Superstorm Sandy, AI had projects related to Hurricanes Irma, Matthew, Maria and Harvey, as well as flooding and wildfires in California. (Id. ¶ 436) AI has never offered Patrick a new assignment. (Id. ¶ 437)

## ARGUMENT

## I. THE SUMMARY JUDGMENT STANDARD

"Summary judgment is inappropriate when the admissible materials in the record make it arguable that the claim has merit." Redd v. N.Y. Div. of Parole, 678 F.3d 166, 174 (2d Cir. 2012) (internal quotation marks and citation omitted). In deciding the motion, a court must "resolve all ambiguities, and credit all rational factual inferences, in favor of the plaintiff." Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 122 (2d Cir. 2004). "The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment[.]" Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994). The Second Circuit has "long recognized

'the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent.'" Walsh v. N.Y.C. Hous. Auth., 828 F.3d 70, 74 (2d Cir. 2016) (quoting Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010)). Finally, a court may not give credence to the moving party's evidence unless it comes from disinterested witnesses and is neither contradicted nor impeached. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000); see In re Dana Corp., 574 F.3d 129, 152-53 (2d Cir. 2009) (reversible error to rely on testimony of interested witness).

Defendant acknowledges that the City Law is more expansive than federal and state law. (Def. Br. 5-6) As a plaintiff need only show that she was treated "less well, at least in part" for a discriminatory or retaliatory reason, Mihalik v. Credit Agricole Cheuvreaux, N.A., Inc., 715 F.3d 102, 110 & n.8 (2d Cir. 2013), summary judgment is less available. A court "must" deny summary judgment under the City law "[i]f the plaintiff responds with some evidence that at least one of the reasons proffered by defendant is false, misleading, or incomplete." Bennett v. Health Mgmt. Sys., Inc., 936 N.Y.S.2d 112, 123, 92 A.D.3d 29 (App. Div. 2012).

## II. PLAINTIFF'S SEX-BASED HARASSMENT CLAIM SHOULD NOT BE DISMISSED

Evaluating the evidence as a whole, rather than in "piecemeal" fashion, see Walsh, 828 F.3d at 76; Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010), plaintiff has adduced sufficient basis for a sex-based hostile work environment under federal and state law. She has thus also met the City Law standard that she was treated "less well, at least in part" due to her gender. See Mihalik, 715 F.3d at 110. There is also sufficient evidence to hold defendant liable for the harassment.

Defendant has accurately stated the general standards for hostile work environment claims. (Def. Br. 5-6) It makes only passing reference to the affirmative defense under the City Law that the conduct amounted to no more than a "petty slight." (Def. Br. 6) Not only can defendant not

prove it prevails on this affirmative defense as a matter of law, but defendant did not plead the affirmative defense in any of its Answers (Dkt. Nos. 19, 22, 36, 48), and thus has waived the defense. See Delville v. Firmenich Inc., 920 F. Supp. 2d 446, 466-67 (S.D.N.Y. 2013).

A. The Harassment Was Based on Sex

There is ample evidence that Kinney's conduct toward Patrick was based on her sex. It is therefore a question for the jury. See Kaytor, 609 F.3d at 548; Fisher v. Mermaid Manor Home for Adults, LLC (Fisher I), No. 14-CV-3461 (WFK)(JO), 2016 WL 7330554, at *3 (E.D.N.Y. Dec. 16, 2016). As soon as Rigling transferred from his position as Patrick's supervisor, Kinney viewed Patrick as fair game. (See Pl. 56.1 ¶¶ 235-37) His conduct was often physically intimidating, such sneaking up behind her, standing over her while she was seated, and wagging his finger in her face. (Id. ¶¶ 241, 243, 264-65, 286) He spoke to her in a mocking tone. (Id. ¶¶ 241, 264, 269, 286) His mocking references to her as "Miss" and "Missy" were explicitly gender-based. See Kopp v. Samaritan Health Sys., 13 F.3d 264, 267 (8th Cir. 1994) (evidence of gender-based hostile environment included that harasser said, "Listen little lady"). Kinney humiliated Patrick by forcing her to do pointless tasks, such as moving boxes out from under tables and marching her to the garage to move her car several inches. (Id. ¶¶ 242-45) Kinney's attempt to destroy State applicant files was the most extreme effort to punish Patrick. The incident on the subway steps was physically intimidating. (Id. ¶¶ 261-68)

After Patrick complained about Kinney's harassment, she was told on October 21, 2014, that Kinney would no longer be the FEMA point person for her floor and had been ordered to stay away from her and her floor. (Pl. 56.1 ¶¶ 285-86) However, if Kinney had been given that instruction, he regularly flouted it. (Id. ¶¶ 312-15) Patrick advised her managers that she had seen Kinney "more times than [she could] count" since she was told that he would stay away from her. (Id. ¶ 312) His repeated appearances, including to do things like make copies next to her,

which he could do on other floors or at copy machines on her floor but further away from her, caused Patrick extreme distress. (Id. ¶¶ 286, 312-13) Whenever Patrick saw Kinney, she got up and moved away. (Id. ¶ 314)

Defendant argues that because Kinney was difficult or argumentative toward men, plaintiff cannot establish that he was motivated by her gender (Def. Br. 6-9), ignoring significant evidence. Patrick testified that she never saw Kinney be abusive or condescending toward men. (Pl. 56.1 ¶¶ 236, 269) AI has presented no evidence that Kinney ever engaged in humiliating conduct toward men, such as when he forced Patrick to move her care a few inches for no reason. (Id. ¶ 244) Even if a jury determined that Kinney's initial interactions with Patrick were not gender-based, the evidence is that his escalation certainly was. (Id. ¶ 312) There is no evidence that Kinney ever tried to do something as extreme as destroying State files to punish any man or was physically threating to men as he was to Patrick on several occasions, the subway incident being the most egregious. (Id. ¶¶ 262-67, 269, 288, 312, 334) Nor is there any evidence that any man was so frightened of Kinney that he took steps to avoid him and arranged for escorts or that anyone advised any man he should take such extraordinary measures. (Id. ¶¶ 272, 289-91, 304, 330, 339, 344, 347)

There are numerous cases in which courts have held that an abusive jerk can create a gender-based hostile work environment, so long as his treatment of women is worse or of a different nature than his treatment of men. See Kaytor, 609 F.3d at 549 (reversing grant of summary judgment and finding that sex-neutral acts contributed to hostile environment, including a threat to choke plaintiff); Steiner v. Showboat Operating Co., 25 F.3d 1459, 1463-64 (9th Cir. 1994) (reversing summary judgment; although harasser was abusive to men and women, his abuse of women targeted their gender); Kopp, 13 F.3d at 268 (reversing grant of summary judgment;

harasser abused men but was worse to women); Zakre v. Norddeutsche Landesbank Girozentrale, 396 F. Supp. 2d 483, 511 (S.D.N.Y. 2005) (evidence that harasser was more abusive to women than men sufficed to meet "because of sex" element on summary judgment motion); cf. Fisher v. Mermaid Manor Home for Adults, LLC (Fisher II), 192 F. Supp. 3d 323, 330 (E.D.N.Y. 2016) (racially hostile environment claim survived motion for summary judgment; in addition to a racist incident, hostile conduct included "intentionally running into [p]laintiff," "laughing in [p]laintiff's face and mocking her around co-workers," "attempting to intimidate [p]laintiff," removing papers form plaintiff's notebook and putting them in other books, and "refusing to move out of the doorways for [p]laintiff."). As the Second Circuit stated, "the inquiry into whether ill treatment was actually sex-based discrimination cannot be short-circuited by the mere fact that both men and women are involved. For it may be the case that a co-worker or supervisor treats both men and women badly, but women worse." Brown v. Henderson, 257 F.3d 246, 254 (2d Cir. 2001).[2]

The case of Castagna v. Luceno, is particularly instructive. 558 F. App'x 19 (2d Cir. 2014). The evidence upon which the district court had relied in granting summary judgment included testimony that the harasser was abusive to men, screaming and cursing at them (e.g., "F-ing son of a bitch"). Castagna v. Luceno, No. 09 Civ. 9332(ER), 2013 WL 440689, at *2-3 (S.D.N.Y. Feb. 4, 2013). The harasser even yelled and cursed at customers. Id. at *3. There was one incident in which the harasser went to where plaintiff sat, yelled at her, and shoved her computer toward her, causing plaintiff to fear for her safety and file a police report. Id. There were two incidents directed at other women, one in which the harasser screamed and cursed at a woman and put his finger in

[2] In Brown, the plaintiff lost because the evidence was that the harassment was motivated by her union activity and her purported affair with a married co-worker rather than her gender. 257 F.3d at 255-56. The other cases cited by defendant (Def. Br. 21) are similarly inapposite. See Beale v. Mount Vernon Police Dep't, 895 F. Supp. 2d 576, 587-88 (S.D.N.Y. 2012) (both men and women complained about harasser; plaintiff admitted the yelling at men occurred under circumstances similar to incidents directed at her; no physically threatening conduct); Curtis v. Airborne Freight Co., 87 F. Supp. 2d 234, 249 (S.D.N.Y. 2000) (plaintiffs testified that two incidents were not motived by their race; no evidence those of other races treated differently).

her face, causing her to feel physically threatened and to resign, and another in which he threw a coffee cup against a wall close to an employee who was also his wife. Id. at *4. The harasser never used overtly sexist language when addressing female employees directly. Id. The Second Circuit reversed summary judgment on the claim of a gender-based hostile work environment. Castagna, 558 F. App'x at 21-22. The Court found it particularly significant that the harasser had engaged in physically threatening conduct toward the three women but no men, and that when combined with evidence that outbursts toward women were worse and included gender-based language ("bitch[es]"), was sufficient to demonstrate a gender-based hostile work environment. Id.

Defendant ignores the evidence that Patrick, as well as employees of AI and FEMA, viewed Kinney's conduct toward her as sex-based and threatening. Plaintiff called Kinney's behavior "sexist" and repeatedly referred to her complaint about his conduct as an "EEO" matter. (Pl. 56.1 ¶¶ 286, 322, 330) Covell told Patrick that Kinney would not have treated her as he did if she were a man. (Id. ¶ 305) Covell told Patrick that if FEMA fired Kinney they could not control him, making him more dangerous, and suggested she be escorted to and from the garage. (Id. ¶ 304) Cleaves made numerous statements expressing concern that Kinney could be more dangerous to Patrick now that she had escalated her concerns. (Id. ¶¶ 295, 307, 318) Cleaves, a trained former federal EEO officer, repeatedly referred to Patrick's complaint as an EEO matter. (Id. ¶¶ 44, 99) Cleaves testified that he understood Patrick was complaining about harassment relating to her gender. (Id. ¶ 44) Nelson, FEMA's Equal Rights Officer, also referred to it as an EEO concern and told Patrick that what she was complaining about was gender-based harassment. (Id. ¶¶ 44, 298; Def. 56.1 ¶ 105) Referring to a matter as an "EEO" issue is widely understood (including within the federal government) to refer to an issue relating to discrimination in employment, not

general interpersonal relationships.[3] If all these people, including those with expertise, thought Kinney's conduct was gender-based, a jury would be justified in reaching the conclusion that Kinney's actions were "motivated, at least in part," by Patrick's gender. Cf. Fisher I, 2016 WL 7330554, at *9 (citation omitted).

B. The Harassment Was Sufficiently Severe or Pervasive

The harassment Patrick experienced was sufficiently severe or pervasive under federal and state law.[4] The law is well-established that physically threatening conduct suffices to meet the standard. See Castagna, 558 F. App'x at 21; Kaytor, 609 F.3d at 550-52; Cruz v. Coach Stores, Inc., 202 F.3d 560, 571 (2d Cir. 2000) (holding that harasser's conduct, which repeatedly ended with him backing plaintiff into the wall, "brings this case over the line separating merely offensive or boorish conduct from actionable sexual harassment"), superseded on other grounds by N.Y.C. Local L. No. 85; Creacy v. BCBG Max Azria Group, LLC, No. 14 Civ. 10008 (ER), 2017 WL 1216580, at *8-9 (S.D.N.Y. Mar. 31, 2017) (denying summary judgment and finding two incidents of physically threating conduct by customer sufficed to meet severe or pervasive standard). Several AI employees believed that Kinney's conduct was sufficiently serious that he should be fired or at least removed from the JFO. (Pl. 56.1 ¶¶ 279; Def. 56.1 ¶ 99)

Defendant is also dismissive of Kinney's conduct after the subway incident, arguing Kinney was merely present on Patrick's floor several times. (Def. Br. 18) Once again, defendant ignores significant evidence and fails to construe the evidence in plaintiff's favor. As frightened as Patrick was about the subway incident, she was even more frightened after Covell suggested

[3] See, e.g., https://www.dol.gov/general/topic/discrimination; https://www.gsa.gov/about-us/organization/office-of-civil-rights/equal-employment-opportunity; https://en.wikipedia.org/wiki/Equal_employment_opportunity.
[4] Defendant recognizes (Def. Br. 21-22) that City Law claims can survive even if they fail to meet the "severe or pervasive" test, and challenges the City Law claim only on the basis that plaintiff has not demonstrated that the harassment was gender-based.

that Kinney was dangerous and that she should be escorted to and from the garage. (Pl. 56.1 ¶¶ 304-05) Cleaves shared the concern that Kinney may be dangerous. (Id. ¶¶ 295, 307, 317-18) Cf. Kaytor, 609 F.3d at 552 (evidence of severity that co-workers told plaintiff she should be concerned about threat to choke her). Patrick had also been assured that FEMA directed Kinney not to go to her floor.[5] (Id. ¶¶ 309-11) Thereafter, Patrick repeatedly saw Kinney on her floor, sometimes doing things like making copies next to her, that he could have done on several other floors. (Id. ¶¶ 312-313) Patrick believed that Kinney was demonstrating to her that her complaints could not stop him. (Id. ¶¶ 312, 315) This context is critical. Absent it, Kinney making a copy near Patrick sounds banal. In an analogous situation, a woman would think nothing of seeing a man walk past her house on several occasions or standing in front of her office building. But if that man had previously threatened her, she would understand him to be stalking her, particularly if there was a directive for him to stay away from her home and office. See Steiner, 25 F.3d at 1462 (harassment included that after plaintiff complained, harasser would show up for work early, as plaintiff was finishing her shift and stare, snicker, or make comments); Ellison v. Brady, 924 F.2d 872, 883 (9th Cir. 1991) (holding that in some cases, mere presence of harasser can create a hostile work environment).[6] Patrick told AI repeatedly that she feared for her safety and that the environment was affecting her physically and mentally. (Id. ¶¶ 284-85, 312, 315, 330, 339, 347-48)

While Kinney's conduct alone sufficed to create a hostile work environment, Patrick faced added stress and intimidation because the FEMA employees who were supposed to be addressing

[5] Defendant notes that Patrick went to Kinney's floor (Def. Br. 18), but omits that she only went there to meet with Nelson. (Pl. 56.1 ¶ 135)

[6] The Ninth Circuit also recognized that, "Women who are victims of mild forms of sexual harassment may understandably worry about whether a harasser's conduct is merely a prelude to violent sexual assault," and that men, who are rarely sexual assault victims, may not have "a full appreciation of the social setting or the underlying threat of violence that a woman may perceive." Ellison, 924 F.2d at 879.

her harassment complaint made her feel more frightened, misrepresented what she was telling them, and pressured her not to pursue a formal complaint. (Pl. 56.1 ¶¶ 299, 303) The message to Patrick that pursuing her complain could be placing her in danger exacerbated Kinney's ongoing conduct. See Fisher II, 192 F. Supp. 3d at 330 (mishandling of complaint contributed to hostile environment).

C. Defendant is Liable for the Harassment

The Second Circuit will impute liability to an employer for harassment by a non-employee under the same standard used for co-worker harassment, with the additional consideration of "'the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees.'" Summa v. Hofstra Univ., 708 F.3d 115, 124 (2d Cir. 2013) (quoting 29 C.F.R. § 1604.11(e)). Thus, as in a co-worker harassment case, the employer will be liable if it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action. Id. (internal quotation marks and citation omitted).

Defendant argues that the standard for liability under the City Law is stricter because it refers to liability for "employees" and "agents." (Def. Br. 23 (citing N.Y.C. Admin Code § 8-107(13)(b))) In essence, defendant argues that the employer can sit on its hands while one of its employees is sexually harassed. That, of course, is not the law. The City Council has repeatedly made clear that the City Law is intended to be more protective of employees than federal or state law, that federal law is intended to be a floor, and that exceptions to the law should be construed narrowly. N.Y.C. Admin. Code § 8-130; Mihalik, 715 F.3d at 108-09. The Summa standard has thus been applied to deny summary judgment under the City Law for harassment of an employee by a store's customers. See Swiderski v. Urban Outfitters, Inc., No. 14-CV-6307, 2017 WL 6502221, at *7-9 (S.D.N.Y. Dec. 18, 2017). While State Law does have a higher standard, of

condonation, condonation does not require "affirmative endorsement of the offending action." Id. at *10.

When Patrick first complained about Kinney, managers at the JFO tried to get FEMA to act. Cleaves in particular recognized the potential danger Kinney posed and advocated removing him from that location, if not firing him. (Pl. 56.1 ¶¶ 99, 117) Cleaves recognized that FEMA's response was inadequate and that Nelson was not properly handling Patrick's complaint of harassment. (Id. ¶¶ 300-02, 306-08, 319, 351) However, much of the burden of avoiding contact between Patrick and Kinney was on Patrick, who arranged for co-workers to escort her to the garage and other parts of the building and who left her work area whenever Kinney appeared. (Id. ¶¶ 289-91, 314, 339, 348) Patrick repeatedly tried to make a formal complaint, only to learn that the FEMA formal process was only for FEMA employees and applicants.[7] (Id. ¶¶ 157, 303) As Kinney continued to defy any directive he was given and FEMA pressed Patrick to drop her complaint, Maiellano agreed that Patrick should record conversations about her complaint to protect herself, advice that she took. (Id. ¶¶ 106, 133) See Fisher II, 192 F. Supp. 3d at 330 (denying summary judgment; noting that employer's handling of plaintiff's complaints "created such an atmosphere of distrust that [p]laintiff found it necessary to make audio recordings of her conversations at work").

While AI could not discipline Kinney, there were other actions it could have taken. Contrary to AI's harassment policy, its HR representative did not speak with Patrick until about a month after her complaint and only after Patrick insisted on it, and never conducted an

[7] Defendant also refers in its 56.1 statement to an investigation by federal employee Charles Arnone. (Def. 56.1 ¶¶ 160-65) While plaintiff fully cooperated with Arnone, Arnone was investigating only the attempted destruction of the State files, not Kinney's harassment of plaintiff. (Pl. 56.1 ¶ 441)

investigation.[8] (Pl. 56.1 ¶¶ 16, 338, 342, 344) AI did not have a State EEO officer speak to Patrick. (Id. ¶ 325) AI talked about having someone from the State speak with FEMA (id. ¶ 394), but there is no evidence any such request was ever made. The State had previously succeeded in getting FEMA to remove a different difficult employee. (Id. ¶ 181) AI did not have one of its managers at the JFO stay near Patrick while she worked; had AI done so, the manager could have confronted Kinney when he made one of his visits to Patrick's floor.[9] Cf. Summa, 708 F.3d at 124-25 (part of university's appropriate remedial response was that upon incident on bus, coach immediately instructed players to be quiet and stationed himself near the plaintiff for the rest of the ride).

AI's efforts to help Patrick changed with two conditions. Patrick, understandably frustrated with the ongoing harassment, said she held AI accountable and was thinking of hiring an attorney. (Pl. 56.1 ¶¶ 323, 338) Soon after that, Cleaves left AI. (Id. ¶ 353) Those who remained at AI grew weary of Patrick's complaints. When Patrick finally spoke with AI's HR representative and CFO, much like FEMA had done, AI falsely claimed after the meeting that Patrick agreed that the situation had improved to the point that she no longer felt she needed escorts to the garage. (Id. ¶¶ 345-46) When Patrick retained counsel who wrote to AI, AI quickly responded by sending Patrick a letter stating that if she did not feel safe at work, AI was accepting no responsibility and she should quit. (Id. ¶ 370) Cleaves had previously recognized that such a "solution" was not only unfair, but illegal, and testified that rather than telling Patrick to quit, AI should have continued to press FEMA until appropriate action was taken. (Id. ¶¶ 296, 371-72) AI management seemed sure that Patrick would accept their advice and stay away. (Id. ¶¶ 388, 406) DeFuria, in the

[8] Almost four months passed between Patrick's initial complaint and firing, ample time for an investigation to be conducted.

[9] AI had Patrick moved to the eighth floor outside of Szymanski's office upon her return from her demobilization, but did so only after she had retained counsel and did so apparently without making sure that Kinney was ordered to stay away from the eighth, rather than the seventh, floor. (Pl. 56.1 ¶¶ 179, 193, 393)

meantime, was ensuring that Patrick would never return by arranging for the State to cut her position. (Id. ¶¶ 406, 413) When Patrick had the nerve to return to her job, she was fired on her third day back. (Id. ¶ 423)

Two courts in recent years have denied summary judgment to retail operators for the conduct of customers. In Creacy, plaintiff worked for a clothing company within a Lord & Taylor department store. 2017 WL 1216580 at *1. On two occasions, a customer was abusive and threatening to the plaintiff and made repeated reference to "you people." Id. at *1-3. The defendant argued it could not be held liable for the actions of the customer, noting that Lord & Taylor's security department arrived at the site immediately upon being called after each incident, that defendant's loss prevention mangers spoke with the plaintiff and Lord & Taylor, and that defendant did not have the authority to ban the customer from Lord & Taylor. Id. at 10. The court denied summary judgment, relying in part on the failure of defendant's human resources department to investigate, as required by its policy, and its failure to train its employees on "proper harassment training and corrective actions."[10] Id. at 11.

In Swiderski, the plaintiff was sexually harassed by two different customers at the store where she worked. 2017 WL 6502221, at *1-2. Defendant argued that it would not be held liable because it promptly ejected each offending customer. Id. at *8. The court denied summary judgment under the City Law, finding that a jury could find the store negligent for failing to take "proactive" steps to prevent future harassment, conduct training on how to handle such incidents, or investigate.[11] Id. Defendant argues that Swiderski misinterprets Summa in requiring "proactive"

[10] Just as it fell to Patrick to avoid Kinney, the plaintiff in Creacy was directed to go to the stockroom if the customer reappeared. Id. at *5.

[11] In Swiderski, the court granted summary judgment on the State Law claim about the customer harassment, finding insufficient evidence of condonation. Id. at *9. However, unlike this case, the defendant in Swiderski did not fire the plaintiff.

action. (Def. Br. 22 n.2) However, in the more prevalent co-worker context, remedial action means correcting and preventing harassment. See Brabson v. The Friendship House of W. N.Y., 46 F. App'x 14, 17 (2d Cir. 2002); E.E.O.C. v. Suffolk Laundry Servs., 48 F. Supp. 3d 497, 521 (E.D.N.Y. 2014).

This Court, in a co-worker racial harassment case, denied summary judgment and later affirmed a jury verdict where the defendant immediately investigated an incident with a racist photo on Instagram, spoke with one harasser, issued a reprimand to another, and conducted in-service training of its harassment policy. Fisher I, 2016 WL 7330554, at * 4; Fisher II, 192 F. Supp. 3d at 330. A jury was entitled to find the employer liable because it did not address other aspects of the environment, thus failing to prevent other hostile actions from taking place. Fisher I, 2016 WL 7330554, at *4; Fisher II, 192 F. Supp. 3d at 330.

Here, there was not only the inaction of AI, but its ultimate affirmative actions. AI told Patrick that the only way she could stop being stalked and ensure her safety was to quit her job, and when she refused to do so, AI fired her. (Pl. 56.1 ¶¶ 370, 423) Remedial action cannot be considered proper and effective when it punishes the victim, rather than the harasser. See Steiner, 25 F.3d at 1464; Ellison, 924 F.2d at 882. This, combined with its failure to take other actions, would also permit a jury to find that AI ultimately condoned the hostile work environment.

## III. PLAINTIFF'S RETALIATION CLAIM SHOULD NOT BE DISMISSED

Defendant is not challenging plaintiff's prima facie case, only whether she has demonstrated causation. (Def. Br. 26) Defendant's arguments are, like the motion as a whole, premised upon a recitation of "facts" that omits material information and construes all evidence in its own favor.

A plaintiff can prevail even under the federal "but for" causation standard "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's

proffered legitimate, nonretaliatory reasons for its actions." Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013). Causation can also be shown by temporal proximity. Summa, 708 F.3d at 127-28 (finding gap of seven months between protected activity and firing to be sufficiently close). Moreover, "but for" causation does not mean sole cause. Zann Kwan, 737 F.3d at 846.

In November 2014, Patrick began to express frustration that AI was not doing more to protect her from Kinney, and for the first time mentioned the possibility of seeking legal advice. (Pl. 56.1 ¶¶ 323, 338, 348) On December 1, 2014, Maiellano advised Patrick that she would have her scheduled demobilization on December 11, and provided her with details for her demobilization. (Id. ¶¶ 355-56) Shortly after Patrick was demobilized, Cleaves left AI, and his assistant, DeFuria was promoted into his position. (Id. ¶¶ 353-54)

AI and Patrick expected her to return after 30 days of demobilization. (Pl. 56.1 ¶¶ 227, 357) Szymanski asked Patrick to continue working on the organization charts while she was back home, promising to compensate her when she returned in January. (Id. ¶¶ 359-61) On January 6, 2015, Szymanksi emailed Patrick about her remobilization to the JFO; after some emails back and forth, they agreed she would return on January 20, 2015. (Id. ¶¶ 362-65, 374)

On January 14, 2015, AI received a letter from Patrick's counsel asserting claims of gender discrimination and retaliation on her behalf, and expressing concern that Patrick would be returning to a "hostile, potentially unsafe, environment." (Pl. 56.1 ¶ 366) In response, Cuccaro sent Patrick a letter dated January 16, 2015, stating that if she feared for her "physical or mental health," she should not return to work and that whether she returned was "entirely [her] decision." (Id. ¶ 370)

Patrick did return to work, although she was slightly delayed by her medical emergency. (Id. ¶¶ 375-78) Her doctor cleared her to return to work on February 9, 2015, and her counsel sent the doctor's note to AI's counsel. (Id. ¶ 385)

From January 21, 2015 through February 10, 2015, there were a number of emails between AI and the State managers Holmes and Feeney about Patrick, her complaints about Kinney, the need for lawyers to speak, and whether the State could cut back on administrative assistants. (Pl. 56.1 ¶¶ 394-412) Much of the information—often misinformation—was from DeFuria to Holmes. DeFuria told Holmes that AI believed that AI and the State were "sitting ducks until lawyers have a chance to connect and determine next steps." (Id. ¶¶ 402, 433) DeFuria altered email chains to remove some of her comments, included the "sitting ducks" sentence. (Id. ¶¶ 416-17) DeFuria and Marini allowed Holmes to think that Patrick failed to return as scheduled for no reason. (Id. ¶¶ 396-97, 400-01) DeFuria told Holmes that AI/State only needed three administrative assistants rather than four, and, based on the information she provided, they decided that there was no need for Patrick to return to work. (Id. ¶ 406) Holmes and Feeney had no problems with Patrick's work, and they never before recommended that a particular administrative assistant be let go, rather than a headcount slot. (Id. ¶¶ 413-14) Holmes testified that it did not matter to the State which administrative assistant was cut from the project and had AI asked to keep Patrick and demobilize another assistant, that would have been fine with the State. (Id. ¶ 414) On January 23, 2015, AI/State had laid off four employees; Patrick was not on the list, nor were any other administrative assistants. (Id. ¶ 415)

When Patrick returned to work on February 9, 2015, she given nothing to do. (Pl. 56.1 ¶ 392) On February 11, 2015, Szymanski and Maiellano told Patrick that she was being demobilized immediately at the direction of the State. (Id. ¶ 423) Maiellano had Patrick escorted out of the

building without allowing her to collect her personal belongings. (Id. ¶ 424) Patrick, who oversaw employee departures had never seen a demobilization handled in that fashion, either with regard to the lack of notice and direction or to the escorting off premises. (Id. ¶¶ 427-28) Although AI has done work on other disasters, it has never re-called Patrick for other work, although it often calls on employees from prior projects when staffing new disasters. (Id. ¶¶ 434-37)

AI's other actions, which are not the subject of defendant's motion, provide further evidence of retaliatory motive. AI never paid Patrick for the work she did while demobilized, even though Szymanksi agrees she should have been paid. (Pl. 56.1 ¶¶ 474-75) AI refused to pay Patrick's expenses for the days following her last day of work while she organized her unplanned move back upstate. (Id. ¶¶ 457-59) AI thoroughly reviewed Patrick's expenses for her remobilization before paying some of them. (Id. ¶¶ 465-66, 470) After Patrick filed this lawsuit, AI filed a counterclaim against Patrick on August 26, 2016, alleging that she had breached her duty of loyalty by submitting expenses to which she was not entitled. (Id. ¶ 477) AI has never sued any other employee over expenses, including DeFuria, who collected per diem payments and a housing allowance for years after moving to New York City by giving AI her father's address in Syracuse. (Id. ¶¶ 479-80, 483)

A jury considering the evidence could find that once Patrick hired an attorney, AI wanted her out of its workforce. When she refused its suggestion that she quit, it manipulated the State into authorizing her firing. There was a flurry of communications about lawyers, Patrick's complaints, and the sudden realization that she was not needed only weeks after telling her that she was needed. Thereafter, AI blacklisted her from its projects, refused to pay her expenses and wages owed, and filed a baseless counterclaim when she had the temerity to sue.

## IV. PUNITIVE DAMAGES CANNOT BE PRECLUDED AT THIS STAGE

Defendant is not entitled to judgment as a matter of law on plaintiff's claims for punitive damages under Title VII and the City Law.[12]

Punitive damages are warranted under Title VII when the defendant "discriminate[d] in the face of a perceived risk that its actions will violate federal law." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536 (1999). "In order to establish malice or reckless indifference, a plaintiff need not show that the defendant committed egregious or outrageous acts." Cush-Crawford v. Adchem Corp., 271 F.3d 352, 356 (2d Cir. 2001). Instead, "[t]he terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law." Kolstad, 527 U.S. at 535.

A defendant need not have direct knowledge that particular acts violated particular laws; instead, "general knowledge of anti-discrimination law and policy is sufficient to ascribe awareness that particular discriminatory acts are prohibited by federal law." Parrish v. Sollecito, 280 F. Supp. 2d 145, 153 (S.D.N.Y. 2003) (collecting cases) (employer's general knowledge of sexual discrimination laws satisfied the standard for awarding punitive damages); see Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 385 (2d Cir. 2001) (employer's training on "hiring practices and equal opportunity" was sufficient to infer the requisite mental state for punitive damages, even without evidence that federal law was discussed during that training); Zakre v. Norddeutsche Landesbank Girozentrale, 541 F. Supp. 2d 555, 562-63 (S.D.N.Y. 2008) (employer liable for punitive damages based on its knowledge that discrimination and retaliation were illegal) (subsequent case history omitted). The circumstances in which a finding of discrimination will not support punitive damages is limited to situations such as when the

[12] Plaintiff agrees with defendant (Def. Br. 30) that punitive damages are not available under the State Law.

underlying theory of discrimination is novel[13] or not widely recognized or where the employer reasonably believes that it meets a statutory exception, such as bona fide occupational qualification. Kolstad, 527 U.S. at 536-37.

It is premature to rule on plaintiff's entitlement to punitive damages before trial. See Creacy, 2017 WL 1216580, at *13-14 (denying summary judgment on issue of punitive damages and noting lack of authority for disposing of issue on summary judgment). The evidence also suffices to support an award of punitive damages. AI managers testified to being aware of the illegality of sex-based harassment and retaliation. (Pl. 56.1 ¶ 438) That alone suffices to meet the federal standard. In addition, Cleaves was a trained EEO officer and made statements at the time recognizing that ending the harassment by removing Patrick from the workplace was illegal. (Id. ¶ 296) AI was also working with outside counsel at the time it wrote the letter to Patrick telling her that she should quit and when it then fired her. (See Id. ¶¶ 343, 368, 381-86, 419, 421) Cf. Zakre, 541 F. Supp. 2d at 563 ("Where there are no novel legal issues of conflicting legal obligations, consultation with counsel may merely demonstrate that a defendant was aware of laws against discrimination and retaliation.").

Under the City Law, a prevailing plaintiff may be awarded punitive damages where she demonstrates that "the wrongdoer has engaged in discrimination with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard." Chauca v. Abraham, 30 N.Y.3d 325, 334, 89 N.E.3d 475 (2017). Unlike the federal standard, the standard for punitive damages under the City Law "does not require a showing of malice or awareness of the violation of a protected right." Batten v. Glob.

[13] Sex-based harassment and retaliation have long been illegal. Liability for harassment by non-employees, while less common, is not novel. Summa was decided in 2013, and relied upon an E.E.O.C. regulation passed in 1980. 708 F.3d at 124 (citing 29 C.F.R. § 1604.11(e)); see 45 Fed. Reg. 74676-74677 (Nov. 10, 1980).

Contact Servs., LLC, No. 15-CV-2382 (NG)(SJB), 2018 WL 3093968, at *9 (E.D.N.Y. June 22, 2018). Because plaintiff satisfies the more stringent federal standard for punitive damages, defendant's motion should be denied as to plaintiff's punitive damages claim under the City Law. See Chauca v. Abraham, 885 F.3d 122, 124 (2d Cir. 2018) (New York Court Appeals "expressly rejected the application of the federal standard for punitive damages").

## V. PER DIEM PAYMENTS ARE PART OF MAKE-WHOLE RELIEF

Defendant seeks to further intrude on the province of the jury by requesting a ruling that should plaintiff prevail her lost wages be limited to her hourly pay, excluding her per diem pay. (Def. Br. 31) Defendant cites to no cases for this novel argument.

Back pay "is intended to make the victims of unlawful discrimination whole." Albermarle Paper Co. v. Moody, 422 U.S. 405, 421 (1975). Back pay is the approximation of what the plaintiff would have been paid had she not been discriminated against, with any uncertainty construed against the wrongdoer. E.E.O.C. v. Kallir, Philips, Ross, Inc., 420 F. Supp. 919, 923-24 (S.D.N.Y. 1976), aff'd, 559 F.2d 1203 (2d Cir. 1977). Back pay is not limited to salary or hourly wages, but also includes bonuses, fringe benefits, overtime, and shift differentials. See Gutierrez v. Taxi Club Mgmt., Inc., No. 17 Civ. 532 (AMD)(VMS), 2018 WL 3432786, at *7-8 (E.D.N.Y. June 25, 2018) (back pay includes overtime), R&R adopted by, 2018 WL 3429903 (E.D.N.Y. July 16, 2018); Epstein v. Kalvin-Miller Int'l, Inc., 139 F. Supp. 2d 469, 484-85 (S.D.N.Y. 2001) (back pay includes bonuses and car allowance); Ingram v. Madison Square Garden Ctr., Inc., 482 F. Supp. 918, 926 (S.D.N.Y. 1979) (back includes fringe benefits such as insurance, pension, vacation and sick pay, as well as overtime and shift differentials).

Had Patrick remained employed at AI past February 11, 2015, she would have been paid per diems. (Pl. 56.1 ¶ 9) AI may have intended per diems to cover food and incidentals when employees were stationed away from home, but employees were not required to use the per diems

for those expenses or any other particular purposes. (Id.) Employees were free to spend—or not spend—the per diems as they wished. (Id.) Defendant's argument that when plaintiff was not working in New York City she had "no need" for the per diems (Def. Br. 31) misses the mark. All back pay is hypothetical. A shift differential is intended to compensate for working an unpleasant shift, but a prevailing plaintiff is entitled to it, even if, due to discrimination, she no longer worked the unpleasant shift. A car allowance may be intended to make a car needed for work more affordable, but the plaintiff who is no longer using the car for work may be awarded the benefit as part of her relief. Plaintiff will not be "made whole" if part of her compensation is excluded from any award.

## CONCLUSION

For the reasons stated above and in the supporting papers, defendant's motion for partial summary judgment should be denied in its entirety.

Dated: New York, New York
August 17, 2018

VLADECK, RASKIN & CLARK, P.C.

By: /s

Anne L. Clark
Attorneys for Plaintiff
565 Fifth Avenue, 9th Floor
New York, New York 10017
(212) 403-7300